# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

| | |
|---|---|
| CONNIE K. HERRING, | |
| Plaintiff, | No. C18-120-LTS |
| vs. | |
| ANDREW M. SAUL, Commissioner of Social Security, | **MEMORANDUM OPINION AND ORDER ON REPORT AND RECOMMENDATION** |
| Defendant. | |

## I.  INTRODUCTION

This case is before me on a Report & Recommendation (R&R) by the Honorable Kelly K.E. Mahoney, Chief United States Magistrate Judge.  Doc. No. 20.  Judge Mahoney recommends that I affirm the decision of the Commissioner of Social Security (the Commissioner) denying Connie K. Herring's application for disability insurance (DIB) benefits under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401, et. seq., and for supplemental security income (SSI) benefits under Title XVI of the Act, 42 U.S.C. §§ 1381, et. seq.  Herring has filed timely objections (Doc. No. 21).  The Commissioner has not filed a response.

## II.  APPLICABLE STANDARDS
### A.  *Judicial Review of the Commissioner's Decision*

The Commissioner's decision must be affirmed "if it is supported by substantial evidence on the record as a whole."  *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .").  "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion."  *Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir.

2003). The Eighth Circuit explains the standard as "something less than the weight of the evidence and [that] allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

In determining whether the Commissioner's decision meets this standard, the court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). The court considers both evidence that supports the Commissioner's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Sec'y of Health & Human Servs.*, 879 F.2d 441, 444 (8th Cir. 1989). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record de novo." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the [Commissioner's] denial of benefits." *Kluesner*, 607 F.3d at 536 (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008)). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson*, 30 F.3d at 939 (quoting *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Baker v.*

*Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984); *see Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005) ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion.").

## B.     *Review of Report and Recommendation*

A district judge must review a magistrate judge's R&R under the following standards:

> Within fourteen days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1); *see also* Fed. R. Civ. P. 72(b). Thus, when a party objects to any portion of an R&R, the district judge must undertake a de novo review of that portion.

Any portions of an R&R to which no objections have been made must be reviewed under at least a "clearly erroneous" standard. *See, e.g.*, *Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting that when no objections are filed "[the district court judge] would only have to review the findings of the magistrate judge for clear error"). As the Supreme Court has explained, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). However, a district judge may elect to review an R&R under a more-exacting standard even if no objections are filed:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude

3

further review by the district judge, sua sponte or at the request of a party, under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 150 (1985).

## III.  THE R&R

Herring protectively filed an application for DIB and SSI benefits on August 11, 2015, alleging an onset date of July 26, 2015, due to excessive obesity, bulging disc, facet arthropathy, foraminal stenosis, canal stenosis, degenerative disc disease, osteoarthritis, scattered lumbar spondylosis, migraines and anxiety. Doc. No. 20 at 3 (citing AR 15); AR 85–86. Her application was denied initially and on reconsideration. Doc. No. 20 at 3 (citing AR 85–156). She requested a hearing before an ALJ and a video hearing was held on December 13, 2017. *Id.* (citing AR 15, 41–42). At the hearing, Herring and a vocational expert (VE) testified. *Id.* (citing AR 15, 41–42).

On April 27, 2018, the ALJ issued a written opinion finding Herring not disabled. *Id.* (citing AR 15–33). The ALJ found that Herring had the following severe impairments: obesity, degenerative disc disease, degenerative joint disease, fibromyalgia/myofascial pain syndrome, migraines/headaches, posttraumatic stress disorder (PTSD) with panic attacks, generalized anxiety disorder and major depressive disorder. *Id.* at 4 (citing AR 17). The ALJ also found that none of the impairments (singly or in combination) met or medically equaled the severity of a listed impairment. AR 18–20. The ALJ then determined Herring had the following residual functional capacity (RFC):

> [Herring] has the [RFC] to perform light work . . . except she cannot climb ladders, ropes, or scaffolds; can occasionally climb ramps and stairs; can occasionally balance, stoop, kneel, crouch, and crawl; can work in job environments where the noise intensity level does not exceed "moderate" as defined in the *Selected Characteristics of Occupations*; can have no exposure to hazards, such as unprotected heights or dangerous, moving machinery; is limited to simple and routine tasks performed in a work environment free of fast-paced production requirements (i.e., no work on an assembly line); and is limited to low stress work, which is defined as

>   involving only simple, work-related decisions and routine work place changes.

Doc. No. 20 at 4 (citing AR 21).

In formulating the RFC, the ALJ assigned little weight to the April 2015 and March 2016 opinions of Herring's treating physician, Stanley Mathew, M.D., whom she saw for pain management. AR 27, 729–34. The ALJ assigned partial weight to the opinions of two state agency medical consultants, Michael Finan, M.D., and Rene Staudacher, D.O., two state agency psychological consultants, Russell Lark, Ph.D., and Myrna Tashner, Ed.D., and two mental health consultative examiners, Michele McNeal, Ed.S., and Linda Aubey, Ph.D. AR 26–29. The ALJ also discounted Herring's subjective statements and her daughter's third-party function report because they were inconsistent with Herring's activities of daily living (ADLs) and treatment notes. AR 22, 30.

The ALJ further found Herring was unable to perform past relevant work but could perform other work available in significant numbers in the national economy, including order caller, photocopy machine operator, housekeeper, document preparer, addresser and call out operator. Doc. No. 20 at 5 (citing AR 32). The ALJ therefore concluded Herring was not disabled. This became the final decision of the Commissioner when the Appeals Council denied Herring's request for review on September 21, 2018. *Id.* (citing AR 1–3).

Herring's arguments focus on the physical limitations the ALJ included in the RFC. Herring argues the ALJ did not give good reasons for discounting Dr. Mathew's March 2016 opinion on her physical limitations.[1] Doc. No. 14 at 4. She also argues no medical evidence supports the ALJ's physical RFC determination because the ALJ assigned little weight to Dr. Mathew's opinions. *Id.* at 8. Further, she argues the ALJ's

---

[1] Herring does not challenge the weight the ALJ assigned to Dr. Mathew's April 2015 opinion.

appointment violated the Appointments Clause of the United States Constitution. *Id.* at 10.

Judge Mahoney first addressed the weight the ALJ gave to Dr. Mathew's March 2016 opinion. Doc. No. 20 at 6. Judge Mahoney noted that Dr. Mathew imposed many extreme limitations because of her back pain and myofascial pain, including that Herring could sit for only thirty minutes at a time for a total of three hours in an eight-hour day, could stand and walk for twenty to thirty minutes at a time for a total of three hours in an eight-hour day, needed a thirty-minute unscheduled break daily to lie down and rest, needed to use a cane to walk or stand and would be absent from work more than five days every month. *Id.* (citing AR 731–33). The ALJ assigned little weight to Dr. Mathew's opinion, finding it was based on Herring's discounted subjective statements[2] and was inconsistent with the objective medical evidence. *Id.* (citing AR 27–28).

Judge Mahoney found substantial evidence supports the ALJ's determination that Dr. Mathew relied on Herring's subjective statements when crafting his March 2016 opinion. *Id.* at 7. Judge Mahoney pointed out that Herring testified that she talked to Dr. Mathew about the limitations that appeared in his opinion. *Id.* (citing AR 28, 59–60). Judge Mahoney noted that a notation in the opinion itself suggests that Dr. Mathew talked to Herring about the limitations in forming the opinion. *Id.* (citing AR 733).

In addition, Judge Mahoney reasoned that not all of the limitations and symptoms included in Dr. Mathew's opinion appear in his treatment notes. *Id.* Dr. Mathew opined that Herring's limitations included limited range of motion, weakness and balance deficits, reduced range of motion in knees, hips and hands, joint warmth, myofascial trigger points, impaired sleep, tenderness, motor loss, reduced grip strength, swelling, muscle spasms, muscle weakness, abnormal gait and a tendency to drop things. *Id.* (citing AR 729–30). However, Judge Mahoney explained that Dr. Mathew's treatment notes do not reflect objective findings of joint warmth, swelling, grip strength or a

---

[2] Herring does not challenge the ALJ's decision to discount her subjective complaints.

6

tendency to drop things. *Id.* at 9. Dr. Mathew also opined that Herring suffered from daily headaches that were moderate to severe and caused dizziness, lethargy and vomiting. *Id.* (citing AR 730). But Judge Mahoney pointed out that treatment notes from Dr. Mathew's office indicate that she complained of a headache only once. *Id.* (citing AR 1100). Judge Mahoney also noted that Dr. Mathew opined that Herring must use a cane while standing and walking, but treatment records do not show that Herring ever used a cane or was prescribed one. *Id.* at 10 (citing AR 732). Judge Mahoney concluded that substantial evidence supports the ALJ's decision to discount Dr. Mathew's opinion because it was based on Herring's discounted subjective statements. *Id.*

Judge Mahoney found that substantial evidence also supports the ALJ's determination that Dr. Mathew's March 2016 opinion is inconsistent with the record as a whole. *Id.* Judge Mahoney explained that although Herring has suffered from chronic pain for years, she has been able to maintain the functionality necessary to work with regular treatment. *Id.* Treatment records indicate that Herring reported improvement in her pain after taking medication and receiving trigger point injections and radiofrequency ablation procedures. *Id.* at 10–12. Judge Mahoney noted that after a radiofrequency ablation procedure in May 2015, Herring reported a 70% reduction in her pain for seven months. *Id.* at 10 (citing AR 515–16, 680–81, 1082). Herring also reported an 80% reduction in pain for three to four weeks following trigger point injections, which she received regularly. *Id.* at 12 (citing AR 1090, 1108, 1110, 1112, 1129).

Judge Mahoney also concluded that substantial evidence supports the ALJ's finding that Herring's ADLs were inconsistent with the extreme limitations Dr. Mathew found. *Id.* at 13 (citing AR 22). Treatment notes reflect that Herring reported a goal of walking two miles daily or going to the gym, as well as a goal of fixing the roof and siding of her house. *Id.* at 12 (citing AR 1017, 1022, 1027, 1033, 1036, 1065, 1067). On two occasions she attended therapy appointments accompanied by grandchildren she was babysitting and, in late 2016, reported a plan to start babysitting a few hours a week. *Id.* (citing AR 1026, 1032, 1044, 1061). In April 2017, she reported that her disability

attorney had advised her not to get a part-time job because it could risk her DIB and SSI applications. *Id.* (citing AR 1032). Judge Mahoney noted that Herring also complained that she had to do 90% of household chores while her daughter, who lived with her, did 10%. *Id.* (citing AR 1026). Judge Mahoney concluded that the record supports the ALJ's determination that Herring was not as limited as Dr. Mathew reported. *Id.* at 13.

Next, Judge Mahoney considered whether medical evidence supports the ALJ's RFC determination given the ALJ had discounted Dr. Mathew's opinions. *Id.* Judge Mahoney noted that the ALJ adopted all the physical limitations recommended by Dr. Finan and Dr. Staudacher and further limited Herring to workplaces with moderate noise levels because of her headaches. *Id.* (citing AR 21, 94–96, 130–33). Judge Mahoney found that the ALJ properly relied on Dr. Finan's and Dr. Staudacher's opinions and the ALJ's independent review of treatment records. *Id.* at 14. To the extent Herring argues the RFC determination is unsupported because the ALJ included a noise limitation, Judge Mahoney explained that an RFC limitation need not be supported by a specific medical opinion. *Id.* at 15 (citing *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016)). Therefore, Judge Mahoney concluded that the ALJ did not err in failing to further develop the record and the RFC is supported by some medical evidence. *Id.* at 16.

Last, Judge Mahoney addressed Herring's Appointments Clause challenge, which Herring did not raise at any point during the administrative proceedings. *Id.* In keeping with the decisions of every judge in the Northern District of Iowa and the vast majority of other district courts, Judge Mahoney found that Herring forfeited her Appointments Clause challenge. *Id.* at 16–18.

## IV. DISCUSSION

Herring's objections to the R&R largely echo the arguments raised in her principal brief. First, she argues the ALJ did not provide a good reason for discounting Dr. Mathew's March 2016 opinion on her physical limitations. Doc. No. 21 at 2. Second, she argues that no medical evidence supports the physical limitations in her RFC because

the ALJ gave little weight to Dr. Mathew's opinions. *Id*. at 3. Third, she argues that Social Security ALJs are inferior officers subject to the Appointments Clause, and that her case should be remanded for a new hearing before a constitutionally appointed ALJ. *Id*. at 3–8. I will address each of these objections.

### A. *Treating Physician's Opinion*

Herring argues that the ALJ did not provide a good reason for the little weight he afforded to Dr. Mathew's March 2016 opinion. *Id*. at 2. Herring argues the ALJ's determination that Dr. Mathew relied, at least in part, on Herring's subjective complaints in forming his opinion does not amount to a good reason to discount Dr. Mathew's opinion. *Id*. Herring states that "every medical provider must rely in part on a claimant's subjective reports of limitations when crafting and providing opinions concerning the claimant's limitations." *Id*. Herring acknowledges that an issue arises when a provider parrots the claimant's suggestions for limitations but argues that Dr. Mathew did not do this. *Id*. Herring also asserts that treatment records support the limitations Dr. Mathew found. *Id*. Finally, Herring argues the ALJ did not address the available opinion evidence in this case in a meaningful way because he "provided essentially the same odd rationale for the weight afforded to each medical opinion." *Id*. (citing AR 26–28, 30).

"The ALJ must give controlling weight to a treating physician's opinion if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." *Papesh v. Colvin*, 786 F.3d 1126, 1132 (8th Cir. 2015) (quoting *Wagner v. Astrue*, 499 F.3d 842, 848–49 (8th Cir. 2007)); *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The ALJ must give "good reasons . . . for the weight [the ALJ gives a] treating source's medical opinion." 20 C.F.R. § 404.1527(c)(2); *see also Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000). An ALJ may discount or disregard the opinion if other medical assessments are supported by more thorough or better evidence. *Fentress v. Berryhill*, 854 F.3d 1016, 1020 (8th Cir. 2017). When medical evidence in the record as a whole contradicts the treating

9

physician's opinion, that opinion is also afforded less deference. *Haggard v. Apfel*, 175 F.3d 591, 595 (8th Cir. 1999). The ALJ may also discount the opinion if it is inconsistent with the physician's own clinical treatment notes. *Davidson v. Astrue*, 578 F.3d 838, 843 (8th Cir. 2009). Further, "an ALJ need not give a treating physician's opinion controlling weight when the opinion is based on a claimant's subjective complaints that ALJ does not find credible." *Vance v. Berryhill*, 860 F.3d 1114, 1120 (8th Cir. 2017); *see also Teague v. Astrue*, 638 F.3d 611, 616 (8th Cir. 2011); *Renstrom v. Astrue*, 680 F.3d 1057, 1064 (8th Cir. 2012).

In his March 2016 opinion, Dr. Mathew opined that Herring's impairments included a reduced range of motion, joint warmth, myofascial trigger points, impaired sleep, tenderness, motor loss, reduced grip strength, swelling, muscle spasms, muscle weakness, abnormal gait and a tendency to drop things. AR 730. He opined that she had moderate to severe daily headaches associated with her back pain that could cause dizziness, vomiting and lethargy. *Id.* He further stated that during a typical workday her pain and stress would be constantly severe enough to interfere with the attention and concentration needed to perform simple work tasks. AR 731. Dr. Mathew opined that Herring could only sit at one time for 30 minutes, stand at one time for 30 minutes and walk at one time for 20 minutes. *Id.* He also opined that Herring must use a cane while engaging in occasional standing and walking. AR 732. Further, he stated that Herring is likely to be absent from work five days or more per month, on average, as a result of her impairments and need for medical treatment. AR 733.

The ALJ gave two reasons to discount Dr. Mathew's March 2016 opinion: (1) it was based on Herring's subjective statements[3] and (2) it was inconsistent with objective medical records. I will address each reason separately.

---

[3] Herring does not challenge the ALJ's conclusion that her subjective statements are not consistent with the medical evidence in the record. Rather, she questions whether the opinion was in fact based on her subjective statements and whether reliance on subjective statements is a good reason to discount a treating physician's opinion.

10

### 1. Based on Subjective Statements

As the ALJ noted, Herring testified that she talked to Dr. Mathew about the limitations that appear in his opinion. AR 28, 59–60. Further, as Judge Mahoney pointed out, a notation in the opinion suggests that Dr. Mathew talked to Herring about the limitations he found. *See* Doc. No. 20 at 7; AR 733. In response to the question, "Are your patient's impairments likely to produce 'good days' and 'bad days'," Dr. Mathew checked "no" and wrote," patient states mostly all bad → worse." AR 733.

Further, some of the symptoms Dr. Mathew included in his opinion are never mentioned in his treatment records. Beginning in January 2014, Herring regularly saw Dr. Mathew or Staci Becker (NP Becker), a nurse practitioner in his office, for chronic neck pain, back pain and myofascial pain. *See* AR 421–22. Consistent with Dr. Mathew's opinion, his treatment notes show Herring regularly had tenderness in her joints, neck, mid back and low back and pain on range of motion of her lumbar spine, cervical spine and upper and lower extremities. AR 421–24, 426, 506–07, 510, 512–14, 516, 582, 584, 586, 726, 1080, 1085, 1087, 1089, 1094, 1100, 1107, 1110, 1116, 1119, 1126, 1128. Dr. Mathew's opinion notes Herring also suffers from joint warmth, motor loss, reduced grip strength, swelling and a tendency to drop things. AR 730. However, these symptoms are not reflected in Dr. Mathew's treatment records.

Dr. Mathew also opined that Herring had daily headaches associated with her back pain that ranged from moderate to severe and could cause dizziness, vomiting and lethargy. *Id.* However, only one of Dr. Mathew's treatment notes indicates that Herring complained of a headache. AR 1100 ("Patient has a headache."). No treatment records reflect that Herring complained of severe or daily headaches that caused her dizziness, vomiting or lethargy. Dr. Mathew further opined that Herring must use a cane when standing and walking. AR 732. Treatment records do not show that Herring ever used or was prescribed a cane. In fact, a different treatment provider noted in February 2017 that Herring "does not use a cane to walk." AR 1096. Dr. Mathew's treatment notes consistently indicate that she ambulated functional distances independently. AR 423–24,

584, 586, 726, 1080, 1084, 1086, 1088, 1094, 1100, 1107, 1109, 1116, 1118, 1125, 1128; *see also* AR 1107, 1109, 1116, 1118, 1125, 1128 (noting Herring's gait was "moderately antalgic favoring the right lower extremity"); Cline v. Colvin, 771 F.3d 1098, 1104 (8th Cir. 2014) (the fact that many of the limitations identified in an opinion "stand alone" and were not addressed in treatment notes is a valid reason to discount the opinion).

Judge Mahoney correctly observed that Herring's ADLs conflict with her subjective statements and Dr. Mathew's March 2016 opinion. *See* Doc. No. 20 at 12; AR 22. Herring testified and stated in her function report that she cares for her three pit bulls, drives to the grocery store, prepares quick meals and performs some household chores. *See* AR 22 (citing AR 47, 57, 72, 311–12). Further, treatment notes indicate that in May and June 2016, Herring was willing to accept placement of her grandchildren if necessary due to her daughter's incarceration. AR 1064, 1066. She informed her mental health therapist during 2016 that she walked two miles daily. AR 1065, 1067. She presented at a therapy appointment in June 2016 with her 9-year-old grandson, whom she was babysitting. AR 1061. In December 2016 she reported that she planned to start babysitting a few hours a week. AR 1044.

In February 2017, Herring presented to the emergency room after injuring her knee while using a stair stepper at the gym and reported that she had been working out at the gym to strengthen her back for the past three weeks. AR 1671. She also told her mental health therapist in February 2017 that she started going to the gym three days a week and planned to fix up her house.[4] AR 1041. In March 2017, she told her primary care provider that she was active in walking and increasing her physical activity at the

---

[4] Herring also told her therapist at this appointment that she "plans to continue cleaning job." AR 1041. While there is no additional information in the record about this "cleaning job" and I do not factor it into the above analysis because there is already ample evidence that Herring's subjective statements and Dr. Mathew's March 2016 opinion are not supported by her ADLs, this statement to her therapist is concerning.

12

gym. AR 963. She also told her therapist that she planned to continue to go to the gym three days a week and to fix her house, and told a nurse practitioner that she participated in regular exercise and went to the gym two to three days a week. AR 979, 1036. In April 2017, Herring continued to report that she went to the gym three days a week and was fixing up her house. AR 763, 1030, 1033. She also reported to her therapist that she was busy all the time with her kids, grandkids and dogs, her kids expected her to do everything and it was difficult for her to get her live-in daughter to do her share of housework. AR 1029, 1032.

In May 2017, Herring continued to report that she planned to go to the gym or walk three days a week and fix the siding and roof of her house. AR 1027. She reported to her therapist that she was frustrated that she had to babysit her grandkids when her kids visited and that she has to do 90% of the housework while her live-in daughter did 10%. AR 1026. She further told her therapist she had started using dating sites and had gone out to dinner a couple times. *Id.* In June and July 2017, she continued to report that she planned on going to the gym or walking three days a week and fixing the siding and roof of her house. AR 1017, 1022.

Herring is correct that a treatment provider's opinion often must rely, at least in part, on a claimant's subjective statements. However, the opinion may be given less weight when it is based on the claimant's subjective statements that the ALJ discredits. Here, there is substantial evidence that Dr. Mathew's opinion was largely based on Herring's subjective complaints. The ALJ discounted those subjective complaints and Herring did not challenge that finding. Substantial evidence on the record as a whole supports the ALJ's decision to assign little weight to Dr. Mathew's March 2016 opinion because it was based, at least in part, on Herring's discounted subjective complaints.

### 2. *Inconsistent with Treatment Records*

Herring has suffered from chronic neck pain, mid back pain, low back pain, myofascial pain and multilevel degenerative joint and disc disease for years. *See* AR 23–

13

25. The ALJ extensively discussed Herring's symptoms, such as tenderness in her neck, mid back and low back, reduced range of motion in her arms and legs, decreased strength and hip, shoulder and joint pain. *See id.* However, substantial evidence supports the ALJ's conclusion that with regular treatment Herring retained the capacity "to perform many basic activities associated with work." AR 31. Treatment records demonstrate that Herring's pain improved with medication, regular trigger point injections and several radiofrequency ablation procedures. *See Wildman v. Astrue*, 596 F.3d 959, 965 (8th Cir. 2010) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling.").

In May 2014, Herring reported to Dr. Mathew that she was "much less painful" and felt that her medication was working and the trigger point injections she received the prior month had worked. AR 425; *see also* AR 506 (reporting in July 2014 that she was "doing fairly well"). After receiving a lumbar epidural steroid injection from her primary care physician, Tork Harman, M.D., in September 2014, she reported that her pain was down to about a 3 on a 10-point scale and was manageable. AR 597; *see also* AR 614, 667 (reported that for one month after the steroid injection her pain was down to a 2 or less). In November 2014, while at an appointment to receive trigger point injections from Dr. Mathew, she reported she was "[d]oing fairly well." AR 510.

In March 2015, she told her physical therapist that she thought physical therapy had helped reduce her bad days and felt that if she continued to do her exercises it would continue to help. AR 660. In April 2015, Dr. Mathew wrote, "[s]he is doing much better, would like to return to work." AR 514. In May 2015, Herring told Dr. Harman that since her lumbar radiofrequency ablation procedure performed a month before her pain had "definitely improved" and decreased to a 1 or 2 on a 10-point scale. AR 680 (also noting that "[h]er pain medicine utilization has essentially stopped"); *see also* AR 515 (In July 2015, Dr. Mathew wrote "[s]he is doing fairly well."), 582 (In October 2015, NP Becker wrote "[s]he is doing fairly well."), 584 (In November 2015, NP Becker wrote Herring was "doing fair."). In December 2015, NP Becker wrote Herring

was "doing fairly well. She responded really well to the Medrol Dose pack. She complains of pain to mid and low back. Today, her pain rating is 3/10." AR 585–86.

In May 2016, Herring reported she was "[d]oing really well" and lost 30 pounds. AR 1080. In June 2016, she had another radiofrequency ablation procedure and reported a few weeks later that her pain was "gradually improving" and she was "[o]verall doing well." AR 1083; *see also* AR 1084 (reported that she responded well to the procedure); AR 1090 (reported improved lower back pain since procedure). In August 2016, she requested trigger point injections because she "responds very well" to them. AR 1086. In January 2017, she complained of increased pain and her medication was adjusted in response. AR 1094–95.

In February 2017, Herring saw Dr. Harman for another radiofrequency ablation procedure and reported that she had 60% to 70% relief from her low back pain for six months after her June 2016 procedure. AR 1096; *see also* AR 1102 (after the procedure she reported that she was satisfied with the progress she has made with her low back pain). In March 2017, she reported she was doing "fairly well" on her current medication. AR 1100. In April 2017, she reported increased pain and her medication was adjusted and in May 2017 she reported that her pain had improved with her medication. AR 1107–08, 1109, 1114. In July 2017, she reported increased pain but relief with increased medication. AR 1116, 1118.

In August 2017, Herring had another radiofrequency ablation procedure and reported that her symptoms were improved by "well over 50%" after her February 2017 procedure. AR 1121. In September 2017, she reported moderate to severe neck, mid back, low back and hip pain and was prescribed a Medrol dose pack in addition to her other medications. AR 1125–26. In October 2017, she reported the Medrol dose pack "worked well." AR 1126.

Further, over the relevant time period, Herring received trigger point injections every few months. AR 422 (January 2014), 423 (March 2014), 424 (April 2014), 506 (July 2014), 593 (September 2014), 508, 510 (twice in November 2014), 512 (December

15

2014), 513 (February 2015), 514 (April 2015), 516 (July 2015), 583 (October 2015), 585 (November 2015), 586 (December 2015), 726 (March 2016), 1081 (May 2016), 1085 (July 2016), 1087 (August 2016), 1089 (September 2016), 1095 (January 2017), 1101, 1105 (twice in March 2017), 1108 (April 2017), 1110 (May 2017), 1117, 1119 (twice in July 2017), 1126 (September 2017), 1129 (October 2017). She reported an 80% reduction in pain for three to four weeks following trigger-point injections. AR 1108, 1110, 1129; *see also* AR 1090, 1112 (reported she had a couple days of improvement following trigger point injections).

Substantial evidence on the record as a whole supports the ALJ's determination that the extreme limitations found by Dr. Mathew are inconsistent with the treatment records. The records demonstrate that Herring's pain could be controlled with treatment. The ALJ thoroughly discussed the treatment records outlined above and gave good reasons for finding them inconsistent with Dr. Mathew's March 2016 opinion. *See* AR 23–25, 27–28. A court may not reverse the ALJ's decision simply because the court may have reached a different conclusion or because substantial evidence supports a contrary conclusion. *Fentress*, 854 F.3d at 1021. I find there is substantial evidence on the record as a whole to support the reasons the ALJ gave for attributing little weight to Dr. Mathew's March 2016 opinion. This objection is overruled.

B. *RFC Determination and Some Medical Evidence*

Herring argues that the ALJ's physical RFC determination is not supported by sufficient medical evidence because he assigned little weight to Dr. Mathew's opinions. Doc. No. 14 at 7. Herring claims that "the ALJ made no effort to independently address each medical source opinion and instead played doctor, conducting his own independent review of the medical evidence and decided what it meant for Herring's RFC." *Id*. at 8. Herring argues the ALJ then provided "the same 'reasons' for the weight afforded to each medical opinion while assigning greater weight to the opinions that fell in line with the ALJ's already set RFC." *Id*.

16

A claimant's RFC is "what [the claimant] can still do" despite his or her physical or mental "limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). To determine a claimant's RFC, the ALJ must evaluate "all of the relevant medical and other evidence" in the record. *See* 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3); *see also Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) ("An ALJ bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence. . . ."). The RFC is a medical question and "must be supported by some medical evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 803 (8th Cir. 2005). Thus, the ALJ is "required to consider at least some supporting evidence from a [medical] professional" that "addresses the claimant's ability to function in the workplace." *Hutsell v. Massanari*, 259 F.3d 707, 712 (8th Cir. 2001) (quoting *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)). However, "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley*, 829 F.3d at 932. Further, if there is no medical opinion evidence regarding a claimant's RFC, "medical records prepared by the most relevant treating physicians [can] provide affirmative medical evidence supporting the ALJ's residual functional capacity findings." *Id.* (quoting *Johnson v. Astrue*, 628 F.3d 991, 995 (8th Cir. 2011)).

Herring's argument that the RFC is not supported by sufficient medical evidence focuses on the weight the ALJ assigned to Dr. Mathew's March 2016 opinion. However, as discussed above, substantial evidence on the record as a whole supports the ALJ's decision to assign little weight to the opinion. As for the other opinions on Herring's physical limitations, the ALJ stated he gave partial weight to the opinions of the state agency medical consultants, Dr. Finan and Dr. Staudacher, but he adopted all the limitations they recommended and added an additional limitation that Herring can be in workplaces with only moderate noise due to her migraines/headaches. AR 26. As discussed above, the ALJ also conducted a thorough independent review of the medical evidence. *See* AR 22–26.

Because substantial evidence supports the ALJ's decision to give little weight to Dr. Mathew's opinion, the ALJ could rely on the state agency medical consultants' opinions and the ALJ's independent review of the medical evidence in formulating Herring's RFC. *See Vance*, 860 F.3d at 1121 (an ALJ who gives good reasons for discounting a treating physician's opinion may rely on the opinions of state agency medical consultants that are more consistent with the medical evidence); *see also Kamann v. Colvin*, 721 F.3d 945, 949–51 (8th Cir. 2013); *Stormo v. Barnhart*, 377 F.3d 801, 806–07 (8th Cir. 2004); *Anderson v. Shalala*, 51 F.3d 777, 779–80 (8th Cir. 1995). Herring claims the ALJ "made no effort to independently address each medical source opinion" and "instead played doctor," but cites to nothing in the record supporting this assertion. The ALJ specifically considered and discussed each opinion in the record and his reasons for the weight assigned to each one. AR 26–30. The ALJ had similar rationale for the weight he gave to Dr. Finan's, Dr. Staudacher's and Dr. Mathew's opinions, but this does not indicate he did not independently assess each opinion. The opinions all addressed the same physical impairments and the limitations found in Dr. Mathew's opinions were far more demanding than the limitations in Dr. Finan's and Dr. Staudacher's opinions and not consistent with treatment records.

Further, the fact that the ALJ conducted an independent review of the medical evidence does not mean that he "played doctor." It is necessary for an ALJ to independently review the medical evidence in crafting an RFC. Here, adequate medical evidence supports the RFC because the ALJ relied on the opinions of two state agency medical consultants and his own independent review of the medical evidence. The ALJ fully adopted the limitations found in Dr. Finan's and Dr. Staudacher's opinions and added a noise level limitation based on his own review of the medical evidence. This objection is overruled.

## C. *Appointments Clause Challenge*

Herring relies on the same arguments made in her principal and reply briefs regarding whether the ALJ was appointed in violation of the Appointments Clause of the United States Constitution. *See* Doc. No. 21 at 3. She notes that the Eighth Circuit heard oral argument on November 13, 2019, in consolidated cases addressing this issue. *Id*. She requests a delay in judgment until the Eighth Circuit issues its decision in those cases. *Id*. She also notes that on February 21, 2020, the Eighth Circuit consolidated a second set of cases involving Appointments Clause challenges to ALJs under the Social Security Administration and that these cases have been screened for oral argument. *Id*. Finally, Herring notes the Third Circuit recently decided, in *Cirko v. Comm'r of Soc. Sec.*, 948 F.3d 148 (3d Cir. 2020), that agency issue exhaustion is not required for constitutional claims for social security disability claimants seeking judicial review in federal district court. *Id*. at 4.

*Cirko* is not binding on this court. Multiple district courts outside the Third Circuit have declined to follow its holding. *See Gagliardi v. Soc. Sec. Admin.*, No. 18-cv-62106-BLOOM/Valle, 2020 WL 966595, at *4–6 (S.D. Fla. Feb. 28, 2020); *Streich v. Berryhill*, No. 3:18-cv-01977 (RAR), 2020 WL 563373, at *2–3 (D. Conn. Feb. 5, 2020); *Ricks v. Comm'r of Soc. Sec.*, No. 18-1097-RLB, 2020 WL 488285, at *3–4 (M.D. La. Jan. 30, 2020); *Ramazetti v. Comm'r of Soc. Sec.*, No. 8:19-cv-260-T-MAP, 2020 WL 428950, at *8 (M.D. Fla. Jan. 28, 2020). Others have adopted it or reached similar conclusions. *See Suarez v. Saul*, No. 3:19-cv-00173 (JAM), 2020 WL 913809, at *2–3 (D. Conn. Feb. 26, 2020); *Tommy A.D. v. Saul*, No. 18-CV-536-FHM, 2020 WL 905213, at *5–6 (N.D. Okla. Feb. 25, 2020); *McCray v. Soc. Sec. Admin.*, No. CIV 19-0090 JB/GBW, 2020 WL 429232, at *13–14 (D.N.M. Jan. 28, 2020). Until the Eighth Circuit decides otherwise, I stand by my previous decisions that "claimants have forfeited the Appointments Clause issue by failing to raise it during administrative proceedings." *See, e.g.*, *Gilbert v. Saul*, No. C18-2045-LTS, 2019 WL 4751552, at *19–20 (N.D. Iowa Sept. 30, 2019).

As Judge Mahoney explained, every district court within the Eighth Circuit to consider this issue, at least at the time her R&R was filed, has reached the same conclusion as has the majority of courts around the country. *See* Doc. No. 20 at 17–18 (collecting cases); *but see* Order, *Wang v. Saul*, No. 18-cv-314 (DTS) (D. Minn. Feb. 28, 2020) (Doc. No. 21-1) (Schultz, M.J.) (following *Cirko*). I decline to issue a stay in this case pending the Eighth Circuit's decision in either set of consolidated cases. This objection is overruled.

## V. CONCLUSION

For the reasons set forth herein:

1. Herring's objections (Doc. No. 21) to the Report and Recommendation (Doc. No. 20) are **overruled**.

2. I **accept** the Report and Recommendation (Doc. No. 20) **without modification**. *See* 28 U.S.C. § 636(b)(1).

3. Pursuant to Judge Mahoney's recommendation:

   a. The Commissioner's determination that Herring was not disabled is **affirmed**.

   b. Judgment shall enter in favor of the Commissioner and against Herring.

**IT IS SO ORDERED.**

**DATED** this 31st day of March, 2020.

_____
Leonard T. Strand, Chief Judge